242 So.2d 627 (1970)
Mrs. Nancy JONES, Widow of Bobby James CHANEY, Individually and for and on Behalf of her Minor Children, Karen Ann, Michael Douglas and Angela Jones Chaney
v.
Benjamin S. BRUPBACHER, Jr., Scott J. Owens, American Employers Insurance Company and Louisiana Power and Light Company.
No. 4086.
Court of Appeal of Louisiana, Fourth Circuit.
December 7, 1970.
*628 Badeaux & Discon, J. Michael Cumberland, New Orleans, for plaintiff-appellant.
Drury, Lozes & Curry, James H. Drury, New Orleans, for Benjamin S. Brupbacher, Jr., Scott J. Owens and American Emloyers Ins. Co., defendants-appellees.
Monroe & Lemann, Eugene G. Taggert, New Orleans, for Louisiana Power and Light Co., defendant-appellee.
Before CHASEZ, REDMANN and DOMENGEAUX, JJ.
REDMANN, Judge.
This wrongful death action was brought by the widow of an electrocuted employee, for herself and her minor children, against two officers of the corporate employer, Albach Co., Inc., (itself liable only for workmen's compensation, R.S. 23:1032) and their insurer. Also a defendant was the utility company which constructed, maintained and supplied the 13,000-volt lines from which the fatal electricity came.
Plaintiff appeals from a judgment dismissing her suit.
Plaintiff's husband met his death when the steel cable he was holding contacted the power line 31.5 feet above the ground.
Decedent, Frank Carton and Michael Robertson were assigned the task of unloading used steel beams from a flatbed truck. The beams were intended for use in constructing an addition to their employer's building, for which a large concrete slab had already been laid.
The slab and the existing building towards its south, the front of the property, had a driveway on each side. The eastern driveway was ordinarily used by customers for pick-up and delivery, but the western driveway was also used, especially by a small truck of the employer.
Three-phase electricity for the employer's plant was supplied by three overhead parallel wires mounted on poles with crossbars along the property's eastern boundary. The poles' centerlines were about 5.5 feet west of the property's fence, and the westernmost line about 3.5 feet further west. Between that line and the vertical projection of the easternmost edge of the concrete slab there was a clear distance of about 17 feet 3 inches.
The defendant corporate officers ordered the steel beams placed on the fence side of the western driveway, so as to leave that driveway usable.
The beams were first removed from the truck into the roadway, by means of a crane which, like the truck, was situated on the large concrete slab. Robertson, the crane operator, at first testified that the deceased had required Robertson to move the crane from its original position to the western edge of the slab closest to the wire; but he retracted that testimony to confirm his earlier deposition statement that it was the defendant Scott Owens, corporate vice-president, and not Chaney who ordered the move in order to facilitate the final moving *629 of the beams from the roadway to its fence side.
Both Carton and Robertson, the other two members of the crew on the scene, testified that at the moment of the electrocution Chaney was walking away from the crane, pulling on the jib line to bring it down to attach to a beam intended to be moved. Robertson indicated Chaney was walking towards the rear of the property but on an angle towards the fence; Carton said Chaney was walking towards the rear of the property, approximately parallel to the fence and the wires. But these witnesses are in agreement that Chaney was walking with the cable to pull it down, which would suggest the cable would have been relatively taut.
(The only other eye witness, Rodney Savoy, who was inside the building and thus somewhat removed, testified that just a second before the accident Chaney had his hands over his head, pulling the cable down, which also does not support the view the cable was being "whipped" about, which was suggested by the trial judge as a possible explanation of the contact with the wires.)
James M. Todd, an expert in mechanical and electrical engineering, testified, from the pertinent known distance measurements, that as a matter of "simple mathematics" the deceased could not have himself pulled the cable into contact with the overhead line.
The pertinent measures (in perpendicular distances where appropriate), all measured after the accident, include: height of boom end of cable above height of wire, 3'; distance from nearest point of cable when hanging plumb to wire, 1.5'; burned point of contact on wire to service pole cross-arm, 9.5'; contact-point on wire to that point on wire opposite plumb-hanging cable, 6.5'; contact-point on wire to ground, 31.5'; contact-point on cable to Chaney's end of cable, 30'; point on ground where Chaney was electrocuted (said by different witnesses to have been from almost directly under overhead wire to 4 or 5 feet out from wire towards slab) to vertical plane including cross-arm, 18'; point on ground where Chaney was electrocuted to point on ground directly under contact-point on wire, 8.5 feet.
From the fact that the boom end of the cable was 1.5' horizontally and 3' vertically away from the electric wire, Todd drew the conclusion that Chaney, on the ground, could not have brought the cable into contact with the wire 31.5' overhead except by going "a considerable distance" on the other side of the wire (in which case the burn on the cable would have been more than 30' from Chaney's end). Todd expressed the opinion that the boom end of the cable had to have moved in order for it to have been possible that the contact occurred at the established points on the cable and wire with Chaney at the point he was. Our calculations using such simple rules as the proportionateness of sides of similar triangles, and square of hypotenuse equals sum of squares of other sides, support Todd's view that no matter in which direction Chaney walked, he could not cause the contact with only 30' of cable between himself and the contact point. Defendants suggested that Chaney was possibly atop a 3' high beam, which would affect Todd's calculations. Yet if we suppose Chaney's end of the cable was 7.5' above the ground (Todd had estimated 4') and the electric conductor therefore only 24' above that level, if the contact occurs 30' along the cable away from Chaney's end, then the boom end of the cable, if vertically 3' higher than the point of contact, would have to be 3.75' direct linear distance from the contact point (the same proportion to 30' of cable as 3' above burn is to 24' above Chaney's end's level). But, if the boom end was in fact situated as placed by the measurements after the accident, (6.5' south, 1.5' east, then 3' higher), then the boom end of the cable would have been in fact about 7.34' direct linear distance from the contact point (X2 = 32 + A2, and A2 = 1.52 + 6.52).
*630 We are satisfied that Todd is correct in concluding the boom end of the cable had to move into, or at least in towards, the wire. The most glaring reason, apart from the mathematics involved, is that Chaney when electrocuted was approximately under (or up to 4 or 5 feet east of) the wire, and if the boom end had remained stationary 1.5' east of the wire contact could not have occurred.
(The only other possibility is that Chaney whipped the half-inch steel cable into the wire. But the evidence is not that he was shaking or whipping the cable as if to free it from some bind. The evidence is that he was only pulling the cable, and the preponderance of the evidence is that he was pulling it by walking away with it.)
Thus, even if we were to assume that the creators of a danger-fraught situation could escape liability where an employee job-obliged to be there should by some foreseeable negligence contribute to his own injury, nevertheless the evidence here persuades us that Chaney did not himself move the cable into the wire. Rather the end of the boomwhich no witness was watching at the moment and the crane operator testified he could not see because of the sunhad to have moved atop or sufficiently close to the wire to cause the contact.
Because we are satisfied the boom moved the cable into the wire, it is not material whether defendants are correct in arguing that Chaney, on his own, decided to use the jib cable rather than the heavy-load block-and-tackle cable suspended from the main boom. Use of the latter would have meant its boom end would have been further away from the wire, but there is no evidence to suggest Chaney would not have been equally electrocuted, because the jib cable would still have contacted the wire when the boom moved. The electricity which went through the whole crane, even its base with a great flash, would equally have coursed through the heavyload cable through Chaney. But we believe that the crane operator's definite testimony that the jib line had been being used ought to be accepted over the inconsistent testimony of Carton, whose testimony ranged from using only the jib, to using the heavy-load only to move this particular oversize beam from the truck to the ground, to using only the heavy-load cable previous to the time that Chaney took the jib cable for this one heavy beam.
Accordingly, the only act we could hold contributory negligence on Chaney's part was his having worked at all in the unsafe place and under the unsafe conditions his employer supplied.
We may at this point observe that there were several alternatives the employer's officers could have utilized to make doing the job safe. There was a small, truckmounted, "A-frame" crane, which in fact completed the job a day or two later, whose "boom" was far shorter than the height of the wires; but some minor repair was needed on that crane. The electricity could have been temporarily disconnected, or insulating "snakes" placed on the lines. The large crane could have been reduced to a safe height by removing its boom's center sections at a labor cost of about $10.
Yet it is not clear from the evidence whether the job conditions were unsafe prior to the moving of the whole crane to the edge of the concrete slab from some more central position. The slab was about 75' wide, and it is not shown how far from the edge it had been situated. Perhaps the crane was originally in such a position, say 10 to 15 feet further away from the edge, that its boom would not have reached the wire even if directed perpendicularly towards it, yet be close enough to accomplish the job with the identical weight-bearing angle of boom to ground.
We therefore conclude that the evidence does not establish negligence on the part of defendant Benjamin S. Brupbacher, *631 Jr., the employer's president, since it is shown that he had left the plant and gone to Norco in the morning. Insofar as is shown, the crane could have been in a reasonably safe position at that time, yet usable for the intended job, without the necessity of shortening the boom or deenergizing the electric wires, etc.
We also conclude the evidence is insufficient to hold the electric company liable. That company knew or should have known, from its maintenance or even meter-reading personnel, that a crane taller than the electric wires was in use on the premises for five or six years. But the evidence is that the crane had never before been used in such proximity to the electric wires.
But we are of the opinion that Scott J. Owens, vice-president and superintendent of Albach, was personally negligent in ordering the crane moved to or in allowing it to remain in a dangerous proximity to the wires, without removing the boom center portions to reduce its height below the wires and without having the wires de-energized or insulated, when his purpose was to have workmen using the crane to move steel beams from the driveway to a location under the wires. Owens did warn the men three or four times about the danger, but in our opinion a workman's superior cannot create or permit danger and send the workman into it with a warning and escape liability on a theory that the workman was contributorily negligent merely by going into the danger. The workman's only other alternatives are to try to tell his superior how to run the job, or to quit.
The evidence that Owens ordered the crane moved came from the crane operator, Robertson, a defense witness. Robertson said Owens came out to tell the crew to clear the beams from the driveway, and that Robertson then moved the crane to the edge of the concrete slab. Asked who ordered the move, at trial Robertson said nobody had, "but Chaney thought it was a good idea to move it closer * *." But Robertson did recall his deposition in the presence of all counsel and defendants Owens and Brupbacher, and counsel for plaintiff read to Robertson part of the deposition including Robertson's statement that Owens "was the one who said to move the crane over so that we could get the iron off the road." Robertson then testified his memory was refreshed; that it was Owens, not Chaney, who told Robertson to move the crane; Robertson "specifically remembered" Owens doing so.
Owens was called as a defense witness after this testimony by Robertson, but he did not deny Robertson's assertion. Owens had been earlier called by plaintiff on cross-examination, when he testified "I think so; I'm not sure" that he had told the crew that in order to move the beams from the driveway and place them under the wires they would have to move the crane. Then, he testified, he came out to the site again and the crane appeared to be too close; but he allowed the men to continue, asking them to be careful, "if it's too close, to be careful." We believe the evidence justifies the conclusion Owens ordered the crane moved closer to the wires, although perhaps not quite as far as the edge of the slab; but he was aware that it had been moved to the edge of the slab.
In our opinion the obligation of an employer and, within the limits of their authority, of its supervisory personnel towards workmen is to provide them with a working place and conditions which are reasonably safe considering the nature of the work. Owens obviously had the authority here. The nature of the work might not have permitted complete safety from the falling of an iron beam (due to another employee's negligence), but it would not have prevented complete safety from electrocution by use of the reasonable available means earlier recited. Owens had the obligation, and the obligation is not fulfilled by providing an unnecessarily unsafe place and conditions *632 and warning the workmen of the danger, especially when safety could so easily and inexpensively have been had. Having set the stage for a slip of the crane boom to kill Chaney, Owens' negligence was a proximate cause of Chaney's death.
We therefore turn to the question whether Chaney's mere working under the known unsafe conditions was itself contributory negligence.
The test for negligence is reasonableness. While it may be true that the reasonable man would wish to avoid the known risk here, an employee is not entirely free to do so. He cannot simply decline to do the work, because he would then subject himself to loss of his job, his means of support for self and family. It would not have helped Chaney to point out the danger to Owens, because Owens already knew it. Nor could Chaney tell Owens how to run the job. It cannot be fairly said that Chaney elected to work under the dangerous conditions (the danger not being an intrinsic feature of Chaney's work). Thus as we see the question, it is whether the reasonable laborer (with a wife and three children to feed, clothe and house) would quit his job or expose himself to being fired, without any immediate prospect of another job, rather than work in the presence of a danger which his job did not necessitate and which he had never previously been called on to tolerate. We simply cannot answer that question affirmatively. We believe Chaney's conduct measured by the reasonable man standard was not negligent, and the defense of contributory negligence therefore falls.
Decedent was 24 years old, and had a life expectancy of about 45 years according to the 1963 United States mortality table in evidence, and a work-life expectancy until age 65 of 41 years. His three children were, at his death, about three and a half years, two years, and half a year in age. His widow testified that his take-home pay approximated $100 a week.
These factors are considered in arriving at quantum for loss of support, although no exact mathematical calculation may be used; McFarland v. Illinois Central R. Co., 241 La. 15, 127 So.2d 183 (1961); Pennington v. Justiss-Mears Oil Co., 242 La. 1, 134 So.2d 53 (1961).
We believe that substantial justice to all parties, and relativity to prior awards, will be accomplished by awarding for both loss of support and loss of the society, guidance and love of their father, and husband, to each of the children $25,000 and to the widow $60,000.
Finally, while it appears to be admitted in its brief that defendant American Employers Insurance Company is the insurer of Owens (as an officer of Albach), evidence of policy coverage limits is not in the record. We will therefore, as to the insurer, remand to the District Court for determination (if necessary) of policy coverage limits and appropriate judgment against the insurer (solidarily liable with its insured, Owens).
Accordingly, the judgment appealed from is affirmed insofar as it dismisses plaintiff's suit against Benjamin S. Brupbacher, Jr. and Louisiana Power and Light Company, plaintiff to bear those defendants' separable costs; and it is in all other respects reversed and there is now judgment against Scott J. Owens and in favor of Mrs. Nancy Jones, widow of Bobby James Chaney, in the amount of $60,000; and further judgment against Scott J. Owens and in favor of Mrs. Nancy Jones, widow of Bobby James Chaney, for and in behalf of her minor children, Karen Ann, Michael Douglas and Angela Jones Chaney, in the amount of $25,000 for each child, and for all other costs of these proceedings; and the matter is remanded for a determination of the extent of solidary liability with Owens of defendant American Employers Insurance Company and for appropriate further judgment in respect to that insurer.
Affirmed in part; reversed and rendered in part; reversed and remanded in part.
*633 CHASEZ, Judge (dissenting).
Bobby James Chaney, an employee of The Albach Company, Inc. of Chalmette, Louisiana was accidentally electrocuted on the 26th day of May, 1966 while performing duties incident to his employment.
Mrs. Nancy Jones, widow of Bobby James Chaney, individually and for and on behalf of her minor children, Karen Ann, Michael Douglas and Angela Jones Chaney, filed this wrongful death action against Benjamin S. Brupbacher, Jr., Scott J. Owens, American Employers Insurance Company and Louisiana Power and Light Company. Both Brupbacher and Owens are officers of the Albach Corporation.
Mrs. Chaney and her three children are receiving compensation under the benefit of the Workmen's Compensation Act.
The plaintiffs allege in their petition that the decedent was killed on the premises of The Albach Company, Inc. at Chalmette, Louisiana when the boom of the crane which was being used to assist in the unloading of steel beams came into contact with a high voltage power line which was located over the work yard and that the proximate cause of the accident was the joint and concurrent negligence of the individual officers of The Albach Company, Inc., i. e. Benjamin S. Brupbacher, Jr. and Scott J. Owens, The American Employers Insurance Company, their insurers, and the Louisiana Power and Light Company.
All defendants in answers filed herein denied that they were negligent in any manner or that they were liable to the plaintiff, averring that the sole and proximate cause of the accident was the negligence and contributory negligence of the decedent, Bobby James Chaney, in failing to heed warnings to maintain the proper lookout, and failing to take reasonable care and to exercise reasonable caution to avoid contact with overhead wires.
I am convinced that this unfortunate accident causing the death of Bobby James Chaney occurred as a result of decedent's own negligence and contributory negligence.
The District Judge, in his Reasons for Judgment, stating the following:
"The deceased, Robert J. Chaney, the deceased's assistant, (Frank Canton (sic Carton) and a crane operator Michael E. Robertson, all employees of the Albach Co., Inc., were working in the yard of said employer engaged in the moving of iron beams from a truck bed to a location in the yard. Said employees had been instructed by Scott J. Owens, superintendent of the corporation and an officer of the corporation to put the beams in the proximity of a fence along the outside perimeter of the yard. Evidently some of the beams had been put in a position encroaching on the driveway coming into the yard and it was the superintendent's object to clear said driveway. The crane used in this job was operating across the driveway from the fence and was situated on a cement slab which was to be the floor of a new building being constructed. The boom of the crane, with an extension, extending approximately 37 feet in length was angled in a direction across the roadway and toward the fence. Above the fence high power lines serving the said Albach Company, Inc. extended along the fence line from the rear to the front area of the yard. At the time of the accident the crane was immobile with its outriggers out and the boom of the crane was in a stationary position. All parties, i. e., the employees and the superintendent were aware of the potential danger of the electrical wires strung overhead and warning had been given by the superintendent Scott J. Owens at the onset of the job and during the course of the job. There was no doubt in the Court's mind that all parties were aware of the potential for danger inasmuch as the tip of the boom extended above the height of the power lines. At the beginning of the job a heavy load line below the height of the *634 power lines was being used and there was no possibility of it coming into contact with the power lines, the only potential for danger being in the event that the crane operator moved the boom into the power lines. The Court gathered that the deceased in order to accomplish the job with greater facility decided to use the load line extending from the top of the boom which load line was above the height of the wires. On cross examination the witness, Frank Canton (sic) stated that the heavy load line was used up to immediately before the accident when Chaney decided to change the procedure. Then Chaney in manually pulling this load line extending from the top of the boom to secure a greater slack in said line either pulled or whipped said load line into the power line thereby causing his own electrocution. The boom of the crane was not over the power lines but was in a position where the angled load line if pulled sufficiently in the direction of the fence could and did come into contact with the power lines. It was evident from the testimony of all witnesses that Chaney had made the choice of the procedures and was personally effecting the particular operation at the time of the accident. There was no doubt in the mind of the Court as to the existence of negligence on the part of the deceased not only in his choice of procedures but also in his operation of that choice.
"The Court considered negligence on the part of the defendant, Louisiana Power & Light Company, and concluded that their installation on the property of the Albach Company, Inc. complied with all recognized safety standards and that said defendant safely guarded against any contingency that could reasonably be anticipated. To (sic) make require the power company to use a higher and consequently more expensive standard of care than used in this instance would, under the circumstances, be an unreasonable requirement and burden.
"The Court further considered the negligence of Mr. Benjamin S. Brupbacher, Jr., and of Scott J. Owens and concluded that the institution of the job by Mr. Brupbacher and its supervision by Mr. Scott, and the equipment used thereon did not per se constitute a commission or omission which the Court would label as negligence. This is not to infer that a different or safer method could not have been devised to accomplish the job which could possibly have given the workmen 100% protection insofar as the power line was concerned. However, the job was accomplished in the manner and with the type of equipment normally used in such operations and the employees were all aware of the potential hazard posed by the power line. In addition to being aware because of their own observations, they were also cautioned by the superintendent Mr. Owens of this danger. Under the circumstances the Court was of the opinion that said employees were not put into a position by the officers of the corporation that was so fraught with danger that they could not operate with safety by using a reasonable degree of care and prudence. It is the opinion of the Court that Mr. Chaney could have performed the operation to which he was assigned with safety had he applied a reasonable appreciation of the dangers involved and had he acted in a reasonable and prudent man ner in accomplishing the job."
I am convinced, as above stated, that decedent was killed as a result of his own negligence.
All members of the crew of The Albach Company, Inc., working on this particular project, were familiar with the danger of contact with highly charged wires and are to blame for the unfortunate accident. Bobby James Chaney was a member of this crew and was directing the movement of the boom of the crane. He, as well as the other members of the crew were warned at least four times by Mr. Owens of the danger of the overhead electric power *635 lines; he was familiar with and aware of the danger in working in close proximity to the overhead electric power line. Despite these numerous warnings, Bobby Chaney persisted in pursuing a course of action fraught with danger.
He grabbed a cable near the overhead electric power line and began pulling it without maintaining a proper lookout to avoid collision and contact with the overhead power line. His two co-workers, Frank Carton and Michael Robertson, both eye-witnesses, state that Bobby Chaney, while pulling and walking back with the cable he was handling, did not look up in the direction of the overhead wires; thus, in not maintaining a proper lookout to avoid pulling the cable into the overhead wires he was negligent.
Bobby Chaney, having been warned of the obvious danger in working in close proximity to the overhead power lines, assumed the risk of exposing himself to a known danger. His patent disregard for his own personal safety in face of this obvious danger was the proximate cause of the accident.
The majority opinion affirmed the judgment of the District Court to the extent of maintaining dismissal of plaintiff's suit against Benjamin S. Brupbacher, Jr. and the Louisiana Power & Light Company, while granting a judgment in plaintiffs' favor against Scott J. Owens, and remanding the action to the District Court for the purpose of determining the liability of American Employers Insurance Company.
Since I am of the opinion that the proximate cause of this accident resulting in the death of Bobby James Chaney was decedent's own negligence and contributory negligence, the judgment of the Court a quo, dismissing the suit of plaintiffs against all defendants, should be affirmed, at their costs.
I therefore respectfully dissent.